1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11

                              ----oo0oo----

12

13  ADMIRAL INSURANCE COMPANY,
    a Delaware corporation,
14                                      NO. CIV. S-05-343 FCD PAN
            Plaintiff,
15
        v.                             MEMORANDUM AND ORDER
16
    J. DALE DEBBER, LORNA MARTIN,
17  DATA CONTROL CORPORATION,
    et al.,
18
            Defendants.
19

20                            ----oo0oo----

21       This matter is before the court on (1) plaintiff Admiral

22  Insurance Company's ("Admiral") motion for summary adjudication,

23  on its first and second claims for relief, to rescind the

24  employment practices liability insurance policies issued by

25  Admiral to defendant Data Control Corporation ("DCC") (the

26  "Admiral EPLI Policies") and (2) defendants DCC, J. Dale Debber

27  ("Debber"), Lorna Martin ("Martin"), Aristos Academy, Compline,

28  LLC ("Compline"), Providence Publications, LLC ("Providence"),

                                 1

Real Consulting & Software Development, LLC ("Real Consulting") and Debber Family Foundation's (sometimes collectively, "defendants") cross-motion for summary adjudication on their affirmative defense of laches.[1]  By its motion, Admiral seeks an order rescinding the Admiral EPLI Policies because DCC failed to disclose in its applications for the policies two prior lawsuits, filed in Nevada County Superior Court by former DCC employees, containing claims for sexual harassment and retaliation against DCC and its Chief Executive Officer, defendant Debber, among others.  Defendants oppose the motion, arguing that they did not fail to disclose material information in applying for the Admiral EPLI Policies, and alternatively, seek a finding that the doctrine of laches provides an absolute defense to Admiral's claims for rescission.

      For the reasons set forth below, the court GRANTS Admiral's motion; the Admiral EPLI Policies are rescinded and void ab initio.[2]  Defendants' cross-motion on their defense of laches is DENIED; Admiral did not unreasonably delay moving to rescind the Admiral EPLI Policies, and there is no substantial prejudice to defendants.

---

[1]     Because oral argument will not be of material assistance, the court orders the motions submitted on the briefs. E.D. Cal. L.R. 78-130(h).

[2]     Resolution of Admiral's instant motion does not wholly resolve this action.  Admiral has also asserted claims against defendants for "reimbursement of defense fees and costs" and "reimbursement of Award Payment," which were not the subject of this motion.  (First Am. Compl., filed Nov. 15, 2005, 3rd and 4th Claims for Relief.)

**FACTUAL BACKGROUND**[3]

### A.   DCC's Application for the 2002 Policy

On November 26, 2002, Monitor Liability Managers, Inc. ("Monitor"), underwriting agent for Admiral, provided a quotation to DCC's broker Swett & Crawford ("S&C") for the issuance of an Admiral EPLI policy to DCC.[4] (Defs.' Opp'n to Pl.'s Stmt. Of Undisputed Facts ["SUF"], filed June 5, 2006, ¶ 8.)  On December 13, 2002, S&C sent an e-mail to Monitor requesting Monitor to bind EPLI coverage for DCC and stating a "completed application" would be "forthcoming." (SUF ¶ 9.)  That same day, Monitor issued a binder for an EPLI policy to DCC for the policy period December 13, 2002 to December 13, 2003 which stated that a condition precedent to coverage was Monitor's "[r]eceipt, review and underwriting acceptance of [a] properly completed, signed and currently dated" original Admiral proposal form for an EPLI policy.  (SUF ¶ 10.)

On February 27, 2003, S&C provided Monitor with said proposal form (the "2002 Application").  (SUF ¶ 11.)  The 2002

---

[3]     Except as otherwise stated by reference to the relevant parties' statement of undisputed and/or disputed facts, the facts recited below are undisputed and/or the parties' dispute with regard to the fact is not material and thus, the court treats the fact as undisputed.  Likewise, the parties have submitted lengthy evidentiary objections to the other side's statement of undisputed facts and underlying evidence; however, much of the evidence objected to is immaterial to the court's analysis of the motions.  To the extent that any objected-to-evidence is relevant and relied on by the court herein, the court overrules any asserted objections to that evidence.

[4]     Both parties describe in detail facts concerning defendants' *prior* EPLI coverage from Lloyd's, London; however, said facts are largely irrelevant to the issues presented by the instant motions and thus, the court does not describe them herein.

3

Application, dated February 11, 2003, was signed by Debber, as Chief Executive Officer of DCC, and by defendant Martin, Chief Technical Officer of DCC. (SUF ¶ 11-12.) Under the heading, "Litigation and Claim Information," Question No. 13 of the application asked DCC whether "[i]n the last 5 years has any current or former employee or third party made any Claim or otherwise alleged discrimination, harassment, wrongful discharge and/or Wrongful Employment Act(s) against the Insured Entity or its directors, officers, or Employees." (SUF ¶ 13.) Question No. 13 specified that a "Claim" was "not limited to the filing of a lawsuit or a complaint with the EEOC or similar state or local agency," but also included a "written demand or a threat by any current or former Employee seeking relief in connection with an employment related dispute or grievance." (Id.)

Question No. 14 of the 2002 Application asked DCC whether "[d]uring the last 5 years, has the Insured Entity or any of its directors, officers or Employees thereof known of, or been involved in any lawsuit, charges, inquiries, investigations, grievances, or other administrative hearings or proceedings before any of the following agencies and/or under any of the following forums[:]"--the National Labor Relations Board, Equal Employment Opportunity Commission, Office of Federal Contract Compliance Programs, U.S. Department of Labor, any state or local government agency such as the Labor Department or fair employment agency or "U.S. District or state court." (SUF ¶ 14.) If the answer to Question No. 13 or 14 was "yes," the application required the applicant to complete a claim supplemental form, "even if such matter has since been settled or otherwise

4

1    resolved." (capitalization omitted.)   (SUF ¶ 15.)

2         DCC, through Debber and Martin, answered "no" to both

3    Question No. 13 and 14.   (SUF ¶ 17.)   Martin attests that she was

4    instructed by DCC's agent/broker to use a previous renewal

5    application for an EPLI policy from another carrier as a template

6    to complete the Admiral application.   (Defs.' Stmt. of Disputed

7    Facts ("DDF"), filed June 5, 2006, ¶ 30.)   That renewal

8    application did not list any prior claims or lawsuits against

9    DCC, since DCC had previously described certain such claims and

10   lawsuits in the original application for coverage from the other

11   company, and the renewal application only requested information

12   about *additional* claims.   (DDF ¶s 3, 6, 8.)

13        In answering and signing the Admiral application, Debber and

14   Martin, "declar[ed] to the best of their knowledge the statements

15   set forth [in the application] are true and correct and that

16   reasonable efforts have been made to obtain sufficient

17   information to facilitate the proper and accurate completion of

18   this Proposal Form."   (SUF ¶ 16.)   They further agreed that "the

19   particulars and statements contained in the [application] and any

20   material submitted herewith are their representations and that

21   they are material and are the basis of the insurance contract."

22   (Id.)   Finally, Debber and Martin agreed that "any Policy, if

23   issued, will be in reliance upon the truth of such

24   representations . . . ."   (Id.)

25        On September 3, 2003, Monitor issued an EPLI policy to DCC

26   for the policy period December 13, 2002 to December 13, 2003,

27   bearing Policy No. 4343312/1 (the "2002 Policy").   (SUF ¶ 18.)

28

### B.   DCC's Renewal Application for the 2003 Policy

On December 4, 2003, Monitor received a faxed copy of a proposal form for the renewal of the 2002 Policy.  (SUF ¶ 20.)  On December 15, 2003, Monitor issued a binder for the renewal of the 2002 Policy for the policy period December 13, 2003 to December 13, 2004 which stated that a condition precedent to coverage was Monitor's "[r]eceipt, review and underwriting acceptance of [a] properly completed, signed and currently dated" original Admiral proposal form for an Admiral EPLI renewal policy.  (SUF ¶ 21.)  On December 22, 2003, F.C. Morgan and Company Insurance Services, Inc. ("F.C. Morgan"), an insurance broker, submitted to Monitor, on behalf of DCC, the signed original Admiral EPLI proposal form for the renewal policy, dated December 12, 2003 (the "Renewal Application").  (SUF ¶ 22.)

Under the heading "Litigation and Claim Information," the Renewal Application contained Question No. 12 that was nearly identical to Question No. 14 in the 2002 Application.  Question No. 12 asked DCC whether "[d]uring the last 5 years, has the Insured Entity or any of its directors, officers or Employees thereof known of, or been involved in any lawsuit, charges, inquires, investigations, grievances or other administrative hearings or proceedings before any of the following agencies and/or in any of the following forums" including any "U.S. District or state court."  (SUF ¶ 23.)  Like the 2002 Application, if the answer to Question No. 12 was "yes," the applicant was required to provide a claim supplemental form, even for those matters which had since been settled or otherwise resolved.  (SUF ¶ 24.)  Finally, the Renewal Application

6

1  contained the same representations by the undersigned(s) as the

2  2002 Application.  (SUF ¶ 25.)

3      DCC, through Debber and Martin, answered "no" to Question

4  No. 12.  (SUF ¶ 27.)  Martin attests that prior to filling out

5  the Renewal Application, she provided complete details of DCC's

6  claims and loss history to Karrie Branson of Placer Insurance

7  Agency ("Placer"), DCC's agent/broker at the time, who then

8  communicated the information to F.C. Morgan (a wholesale

9  brokerage firm through which DCC and Placer were required to

10 route all of their communications with Admiral).  (DDF ¶s 34, 35,

11 36, 39-42.)  Ultimately, Martin declares that F.C. Morgan

12 confirmed Placer's opinion that DCC's prior claims did not have

13 to be listed on the Renewal Application because they were too old

14 (the claims were *first* made more than five years earlier) and

15 thus, no claim supplemental form was required.  Martin states

16 that she filled out the Renewal Application consistent with

17 Placer and F.C. Morgan's advice.  (Martin Decl., filed June 5,

18 2006, ¶s 11-17.)

19     On January 27, 2004, Monitor issued an Admiral EPLI Policy

20 to DCC for the policy period December 13, 2003 to December 13,

21 2004, bearing Policy No. 4343312/2 (the "2003 Policy").  (SUF ¶

22 29.)

23     **C.   The Altman Action**

24     On May 11, 2004, Vickie Altman and her husband, Scott Altman

25 (the "Altmans"), filed a complaint in the Nevada County Superior

26 Court, entitled <u>Vickie Altman, et al. v. J. Dale Debber, et al.</u>,

27 Case No. 69850 (the "Altman Complaint"), against defendants

28 Debber, DCC, Martin, Aristos Academy, Compline, Providence, Real

Consulting and Debber Family Foundation (sometimes collectively, the "Altman defendants"). (SUF ¶ 33.) At the time, Debber was Chief Executive Officer and a shareholder of DCC, Managing Director and a shareholder of Compline, Providence and Real Consulting, the Chairman of the Board of Advisors of Aristos Academy and a co-trustee of the Debber Family Foundation. (SUF ¶ 34.)

The Altman Complaint alleged, among many other claims, claims against the Altman defendants for sexual harassment and retaliation in violation of FEHA and Title VII. (SUF ¶ 35.) Specifically, in paragraphs 21 and 22 of the complaint, the Altmans alleged that Vickie Altman had been hired as an executive assistant to Debber and his wife, Janet, and that "beginning on or about July 1, 2003, and continuing until March 1, 2004 (the date of VICKIE's termination) DEBBER continually and openly sexually harassed VICKIE." (SUF ¶s 36-37.) In paragraph 88, the Altmans alleged that "DEBBER and DATA CONTROL have defended at least three sexual harassment and retaliation lawsuits in Nevada County since 1996" and that "the complaints for these lawsuits contain strikingly similar allegations to those experienced and set forth herein by VICKIE." (SUF ¶ 38.) The Altmans alleged that said lawsuits filed against Debber, et al. in Nevada County Superior Court were: Jenise Whittle, et al. v. Dale Debber, Case No. 58835, filed September 22, 1997 ("Whittle Action"); John Atkinson, et al. v. Dale Debber, et al., Case No. 60533, filed August 6, 1998 ("Atkinson Action"); and Barbara Hunyada v. J. Dale Debber, et al., Case No. 60534, filed August 6, 1998 ("Hunyada Action"). (SUF ¶ 39.) Finally, in paragraph 103, the

8

Altmans alleged that "defendants knew, or in the exercise of reasonable diligence should have known, that DEBBER was a habitual sexual harasser and that an undue risk to persons such as VICKIE existed unless defendants adequately trained and supervised DEBBER in the exercise of the tasks of his employment."  (SUF ¶ 40.)

The Atkinson and Hunyada Actions, filed August 6, 1998, were pending within five years of DCC's application for the 2002 Policy, signed February 11, 2003.  (SUF ¶ 56.)  Ultimately, the Atkinson Action was dismissed on February 24, 1999, and the Hunyada Action settled and was dismissed on March 26, 2001.  (Id.)

> ### D.   **The Tender of the Altman Complaint to Admiral**

On May 24, 2004, defendants tendered the Altman Complaint to Monitor for defense and indemnity.  (SUF ¶ 42.)  On May 28, 2004, Admiral agreed to defend the Altman action pursuant to the 2003 Policy, subject to a full and complete reservation of rights, including but not limited to, the right to "file an action for a judicial determination that [Admiral] is entitled to rescind the Policy and that the Policy is void ab initio and provides no coverage whatsoever to any person or entity."  (SUF ¶ 43.)  In accepting the defense, Admiral agreed to pay counsel of DCC's choice, Irell & Manella, at Admiral's applicable panel rates.  (Id.)  Any difference between Irell & Manella's rates and Admiral's panel rates was to be paid by defendants.  (Pl.'s Opp'n to Defs.' Stmt. Of Undisputed Facts ["SUF II"], filed June 2, 2006, ¶ 15.)

Monitor provided Irell & Manella with certain "claims management guidelines." (SUF II ¶ 16.)  Pursuant to these guidelines, Irell & Manella sent approval requests to Monitor for various staffing issues including sending an associate to interview DCC employees and seeking approval of additional partners to work on the litigation. (SUF II ¶ 19.)  Monitor approved these requests in June 2004. (SUF II ¶ 18.)  On January 11, 2005, Irell & Manella sent a status report to Monitor at Monitor's request. (SUF II ¶ 25.)

Following defendants' tender of the Altman Complaint to Admiral, Admiral investigated various coverage issues related to the complaint. (SUF II ¶ 11.)  On August 5, 2004, Admiral made a decision to file an action to rescind defendants' policies based on defendants' failure to disclose prior legal claims.[5]  (DDF ¶ 52.)

**E.   Litigation of the Altman Action**

On June 2, 2004, the Altman defendants removed the action to the United States District Court for the Eastern District of California. (SUF ¶ 44.)  On August 23, 2004, the Altman

---

[5]   Defendants rely on two separate internal Admiral documents, Exhibits U and V to the Johnson Declaration, filed June 5, 2006, to support this fact.  Each is a one page Admiral "declaratory judgment/rescission form" dated August 5, 2004.  Both forms state "insured failure to disclose prior claims on its policy application" as the basis for rescission, and both forms circle an option labeled "declaratory judgment action seeking rescission to be filed" as the action to be taken.  The meeting attendees are Jim Hill, Randy Mrozowicz, Jennifer Pearson and Brandon Van Wormer.  Admiral's only response relating to these documents is an objection that the August 5, 2004 decision to rescind is immaterial and irrelevant. (DDF ¶ 52.)  However, for the reasons set forth below, Admiral's objection is overruled; the documents and Admiral's August 5, 2004 decision are relevant to the motions, particularly to defendants' cross-motion.

1   defendants' motion to compel arbitration was granted and the

2   action was dismissed.  (SUF ¶ 45.)  On August 11, 2005, Monitor

3   consented to counsel's request to serve the Altmans with an offer

4   of judgment pursuant to Rule 68 of the Federal Rules of Civil

5   Procedure.  (SUF ¶ 49.)  In so consenting, Monitor expressly

6   reserved all rights to seek to rescind the Admiral EPLI Policies

7   and also to seek to recover from the Altman defendants any

8   payment by Admiral in connection with the offer of judgment.

9   (SUF ¶ 50.)  On or about August 18, 2005, the Altmans accepted

10  the offer and thereafter obtained an arbitration award in the

11  amount of the offer.  (SUF ¶ 52.)  On September 26, 2005, Admiral

12  issued a payment ("Award Payment") to the Altmans for the full

13  amount of the award, subject to its reservation of rights to seek

14  to rescind the Admiral EPLI Policies and to seek to recover the

15  Award Payment from defendants in this action. (SUF ¶ 52.)

16          **F.   The Instant Action**

17          On February 22, 2005, Admiral filed the complaint in this

18  action seeking rescission of the Admiral EPLI Policies and for

19  reimbursement of defense payments pursuant to those policies.

20  (SUF ¶ 46.)  On March 1, 2005, counsel for Admiral sent a letter

21  to counsel for the Altman defendants tendering a check for

22  $19,132.00 for the return of the premiums paid by DCC for the

23  EPLI policies and requested that DCC agree to the rescission of

24  the policies in lieu of litigating this action.  (SUF ¶ 47.)  On

25  April 7, 2005, counsel for the Altman defendants rejected the

26  requested rescission and returned the check for the premiums.

27  (SUF ¶ 48.)  In April or May of 2005, defendants secured Dempsey

28  & Johnson P.C. as new counsel for the Altman action and the

11

instant action.  (SUF II ¶ 26.)

On November 15, 2005, Admiral filed a first amended complaint, pursuant to stipulation of the parties, adding a claim for relief for reimbursement of the Award Payment.  (SUF ¶ 54.) On December 2, 2005, defendants answered the first amended complaint.  (SUF ¶ 55.)

## STANDARD

Federal Rule of Civil Procedure 56 allows a court to grant summary adjudication on part of a claim or defense.  <u>See</u> Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim . . . may . . . move . . . for a summary judgment in the party's favor upon all or any part thereof."); <u>see also</u> <u>Allstate Ins. Co. v. Madan</u>, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard applied to a motion for summary adjudication is the same as that applied to a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a), (c); <u>Mora v. Chem-Tronics, Inc.</u>, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).  Thus, summary adjudication is appropriate when the moving party demonstrates that there exists no genuine issue as to any material fact, entitling it to a ruling in its favor as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

When parties submit cross-motions for summary judgment, the court must review the evidence submitted in support of *each* cross-motion and consider each party's motion on its own merits. <u>Fair Housing Council of Riverside County, Inc. v. Riverside Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001).  The court must examine each set of evidence in the light most favorable to the non-moving party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

12

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

**ANALYSIS**

**I.   Admiral's Motion to Rescind the Admiral EPLI Policies**

**A.   Applicable Law on Rescission**

An insurance company has the right to select those whom it will insure and in so deciding, it may rely upon applicants for such information as the company desires as a basis for selecting its risks.  <u>Merced County Mutual Fire Insur. Co. v. California</u>, 233 Cal. App. 3d 765, 773 (1991).  California Insurance Code section 332 provides that each party to a contract of insurance must communicate to the other, in good faith, all facts within his knowledge which are, or to which he believes to be, material to the contract.  As such, a material misrepresentation or concealment in an insurance application, whether intentional or unintentional, entitles the insurer to rescind the insurance policy ab initio.  <u>West Coast Life Insur. Co. v. Ward</u>, 132 Cal. App. 4th 181, 187 (2005); Cal. Insur. Code § 331.  California Insurance Code section 330 defines "concealment" as "[n]eglect to communicate that which a party knows, and ought to communicate."  Section 359 of the California Insurance Code expressly authorizes rescission of a policy where "a representation is false in a material point, whether affirmative or promissory, . . . ."  Such rescission of a policy applies to all insureds under the contract, unless the contract provides otherwise.  Cal. Insur. Code § 650.

To establish that a misrepresentation or concealment on an insurance application is material, the insurer need not prove an actual intent to deceive; an unintentional but material misrepresentation or concealment is sufficient.  <u>West Coast Life</u>

14

1   Insur. Co., 132 Cal. App. 4th at 187.   The purpose of the

2   materiality inquiry is to make certain that the risk insured is

3   the same risk covered by the policy agreed upon.   Old Line Life

4   Insur. Co. v. Sup. Ct., 229 Cal. App. 3d 1600, 1604 (1991).

5   Therefore, materiality is to be determined "solely by the

6   probable and reasonable effect which truthful answers would have

7   had upon the insurer."   Thompson v. Occidental Life Insur. Co. Of

8   California, 9 Cal.3d 904, 916 (1973); West Coast Life Insur. Co.,

9   132 Cal. App. 4th at 187; Cal. Insur. Code § 334.

10        The fact that an insurer has demanded answers to specific

11  questions in an insurance application "usually [is] sufficient"

12  to establish the materiality of those questions as a matter of

13  law.   Imperial Casualty & Indemnity Co. v. Sogomonian, 198 Cal.

14  App. 3d 169, 179 (1988); Thompson, 9 Cal.3d at 916.   Courts have

15  recognized that specifically, an insurance applicant's loss

16  history is a fact material to the insurance risk.   Wilson v.

17  Western Nat'l Life Insur. Co., 235 Cal. App. 3d 981, 993 (1991);

18  Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219, 222

19  (9th Cir. 1995) (an insured's misrepresentations of prior loss

20  history on its insurance application sufficient to void policy).

21        Finally, an insurer has the right to rely on the insured's

22  answers to the questions in the insurance application without

23  verifying their accuracy.   Robinson v. Occidental Life Insur.

24  Co., 131 Cal. App. 2d 581, 585 (1955) ("It was not incumbent upon

25  [the insurer] to investigate [the insured's] statements made to

26  the examiner . . . it was [the insured's] duty to divulge fully

27  all he knew.").

28

15

### B.   The 2002 Policy

Despite being filed on August 6, 1998, within five years of the date Debber and Martin signed the 2002 Application (February 11, 2003), DCC did not disclose the Atkinson and Hunyada Actions on its 2002 Admiral application.  Instead, DCC answered "no" to Questions 13 and 14 of the 2002 Application, specifically requesting information on any employment discrimination, harassment or wrongful discharge claims or litigation against the company and/or its officers, directors, or employees within the prior five years.

The requested information was certainly material to the contract.[6]  Indeed, courts have recognized that where specific questions are asked of the insured, the answers to those questions are normally deemed material to the contract. Sogomonian, 198 Cal. App. 3d at 179.  Regarding specifically an applicant's loss history, courts have found such facts material to the insurance contract.   Wilson, 235 Cal. App. 3d at 993.  In this case, the Admiral application made the import of the subject answers abundantly clear:  it provided that the applicant's representations made therein are "material and are the basis of the insurance contract" and the company issues the policy "in reliance upon the truth of such representations." (SUF ¶ 16, 25.)

---

[6]   Even Debber acknowledged in his deposition that the 2002 Application which he signed was not accurate as to the company's claim history; in his words, DCC had "screwed up" on that application in not disclosing prior claims and/or litigation."  (Debber Depo., April 19, 2006, 92:15-93:22.)

16

Defendants' alleged reasons for the non-disclosure do not alter the analysis.  Martin declared that at DCC's agent/broker's recommendation, she used a former insurance renewal application from another company, which did not disclose the prior claims, as a template for filling out the Admiral application.  However, even an unintentional non-disclosure is sufficient to support rescission of an insurance contract, if the non-disclosed information was material to the contract.  West Coast Life Insur. Co., 132 Cal. App. 4th at 187.  Here, for the reasons set forth above, DCC's loss history was material information to the contract.  The non-disclosure of the information merits rescission of the contract.

In opposition, defendants do not argue the immateriality of the subject information (because under the applicable law they cannot), but instead first contend that the 2002 Policy is "irrelevant" to the action because no claim was tendered against that policy--the Altman Complaint was tendered against the 2003 Policy.  Defendants' argument is wholly without merit.  If the Atkinson and Hunyada Actions had been disclosed in the 2002 Application, no policy would have been issued to DCC in the first instance (let alone any renewal policy).  (Pearson Decl., filed April 14, 2006, ¶ 35.); Wallace v. World Fire & Marine Insur. Co. Of Hartford, Conn., 70 F. Supp. 193, 196 (S.D. Cal. 1947) (misrepresentation in original application provides basis for rescinding renewal policy).  To allow an insured to conceal two sexual harassment and retaliation lawsuits clearly filed within five years of the original application and then claim upon

17

renewal of the policy that those suits are outside the five year period is, understandably, unsupported in law.  Id.

Defendants next argue that the court should not permit rescission of the 2002 Policy because Admiral "could not have relied on DCC's [2002 Application]" in issuing the policy since it issued the binder without receipt of a completed Admiral application and did not provide DCC with an original Admiral application until February 2003.  According to defendants, that Admiral did not review defendants' completed original application until September 2003 is fatal to its claim for rescission. Again, defendants' argument is unavailing.  Monitor's binder for an EPLI policy, issued December 13, 2002, expressly stated that it was conditioned upon the "receipt, review and underwriting acceptance of the properly completed, signed and currently dated ORIGINAL [Admiral] proposal form for an [EPLI] policy."  (Decls. of Pearson, et al., filed April 13, 2006, Ex. F at 29.)  Said binder further stated,

> upon receipt and review of the Proposal Form . . . , Monitor reserves the right to cancel, modify or limit the coverage for this binder" and that in the event that "Monitor determines that it will not issue a policy because the Proposal Form and any related information . . . have either not been received or have been received and are unacceptable, then this binder will be *null and void from its inception*.

(Id. at 31 [emphasis added].)  Defendants ignore these provisions.  Moreover, as a matter of law, a binder is not an insurance policy.  Ahern v. Dillenback, 1 Cal. App. 4th 36, 48 (1991) (binder only effective until application is rejected or policy issued).  Here, no *policy* issued until September 3, 2003 following Monitor's approval of DCC's proposal form (the 2002

Application).  (Decls. of Pearson, et al., filed June 9, 2006, Ex. R.)[7]

Additionally, defendants argue that Admiral cannot assert that it would not have issued coverage in the event of prior claims when the conditional binder contained an express exclusion designed to address and deal with prior claims.  The binder issued December 13, 2002 provided: "As coverage has been bound prior to receipt and acceptance of the Admiral Proposal Form, a Past Acts Exclusion has been attached as of the Policy inception date.  Consideration will be given to removing this exclusion after review of the Proposal Form."  (Decls. of Pearson, et al., filed April 13, 2006, Ex. F.)  However, the Past Acts Exclusion was intended to preclude coverage for any claims, including future claims, arising out of or relating to any "Wrongful Employment Acts" that occurred before the inception of an Admiral EPLI policy issued to an applicant.  (Pearson Decl., filed April 13, 2006, ¶ 13.)  An applicant's responses to questions in the proposal form concerning its claim history were still required for the underwriting determination of whether to insure the applicant.  Based upon the plain language of the 2002 Application

---

[7]    The 2002 Policy was issued on September 3, 2003 largely due to delays in Monitor receiving responses to questions regarding the proposal form.  Specifically, on March 12, 2003, Monitor acknowledged receipt of DCC's 2002 Application and requested an "explanation of Question No. 6 regarding senior management changes."  (Id. at Ex. H.)  On June 11, 2003, Monitor advised S&C in response to an inquiry regarding the status of the 2002 Policy that Monitor had not received the requested information on the senior management changes.  (Id. at Ex. I.)  On July 25, 2003, S&C provided an explanation on the issue.  (Id. at Ex. J.)  On September 3, 2003, the 2002 Policy issued, with the responsible underwriter noting on the EPLI final checklist that there had been no prior claims.  (Id. at Ex. K.)

1  itself, Admiral clearly relied on DCC's responses to the loss
2  history questions in deciding to issue coverage.

3       Finally, defendants argue that the court should not permit
4  rescission of the contract when Admiral issued the policy without
5  "even verifying DCC's claims and loss history."  Clearly, as
6  noted above, Monitor had no obligation to investigate the
7  veracity of DCC's responses to questions in the 2002 Application.
8  Robinson, 131 Cal. App. 2d at 585.

9       **C.   The 2003 Policy**

10      Turning next to the 2003 Policy, rescission of the policy is
11  supported under the same analysis as the 2002 Policy.  Simply
12  stated, DCC answered "no," to Question No. 12 of the Renewal
13  Application, disclaiming any involvement in litigation within the
14  prior five years involving claims of sexual harassment and
15  retaliation, yet the Atkinson and Hunyada Actions were ongoing
16  during that period (the Atkinson Action was dismissed on February
17  24, 1999 and the Hunyada Action settled and was dismissed on
18  March 26, 2001).  For the same reasons as set forth above, the
19  response to Question No. 12 was material to the contract, and
20  DCC's false answer thereto justifies rescission of the policy.

21      Again, defendants' reasons for the non-disclosure do not
22  affect the analysis.  Defendants provide a detailed explanation
23  of their communications with Placer, who in turn communicated
24  with F.C. Morgan, regarding DCC's loss history and the need to
25  report it on the Renewal Application.  (Opp'n to Pl.'s MSJ, filed
26  June 5, 2006, at 21-22.)  Even assuming the truth of these facts,
27  *i.e.*, that DCC responded "no," to Question No. 12 on the "advice
28  of its broker," such reliance is no defense to an action for

20

rescission based on *DCC's* representations in the Renewal Application.  Indeed, defendants cite no case law, nor is the court aware of any, supporting such a defense.  It is DCC, through Debber and Martin, that signed the application attesting to the truth of the various representations made therein.  Certain of those representations, as outlined above, are the basis of Admiral's instant action and support rescission of the 2003 Policy because the responses were both material and false.

Defendants' contention that Question No. 12 should be construed to mean solely "new" lawsuits "first" made in the prior five years is untenable.  The next question on the Renewal Application (No. 13) specifically asked whether any claims had been first made in the last five years.  (Decls. of Pearson, et al., filed June 9, 2006, Ex. P at 76.)  Under defendants' self-serving interpretation, the two consecutive questions would be redundant, rendering one superfluous.  Based on their plain meanings, Question No. 12 pertains to an applicant's knowledge of or involvement in lawsuits in the prior five years, and Question No. 13 relates to claims that had been first made in the prior five years.  (Id.)

**II.   Defendants' Cross-Motion on Laches Defense**

Defendants cross-move for summary adjudication on the ground that the doctrine of laches provides a complete defense to Admiral's claims for rescission.  Specifically, defendants argue Admiral unreasonably delayed rescinding the EPLI policies, causing them substantial prejudice, thus warranting the grant of their motion.

1       California law requires a party seeking to rescind a

2   contract to give notice to the other party promptly upon

3   discovering the facts which entitle him to rescind.  Cal. Civ.

4   Code § 1691.  The California Insurance Code section 650 further

5   provides that the right of rescission of an insurance policy may

6   be exercised at any time prior to the commencement of an action

7   on the contract.  California courts read these statutes together

8   as a requirement that rescission must occur before an action on

9   the policy and within a reasonable time from discovering an error

10  in the policy.  Cole v. A.A. Calaway, 140 Cal. App. 2d 340, 347-

11  348 (1956).  The determination of a "reasonable time" depends on

12  the particular facts of each case.  Id.

13       To prevail on a defense of laches, the defendant must also

14  demonstrate substantial prejudice resulting from the delay.

15  Conti v. Board of Civil Serv. Comm'ners, 1 Cal.3d 351, 359-60

16  (1969) ("If the delay has caused no material change in status

17  quo, ante, i.e., no detriment suffered by the party pleading the

18  laches, his plea is in vain.") (internal quotations omitted).

19  The existence of prejudice to the defendant under California

20  Civil Code section 1693 depends on the specific facts of the

21  case.  In re Consolidated Pretrial Proceedings in Air West Sec.

22  Litig. v. Air West Inc., 436 F. Supp. 1281, 1290 (N.D. Cal.

23  1977).  The burden of affirmatively demonstrating substantial

24  prejudice lies with the party asserting laches.  Miller v.

25  Eisenhower Med. Ctr., 27 Cal.3d 614, 624 (1980).

26       "Generally speaking, the existence of laches is a question

27  of fact to be determined by the trial court in light of all of

28  the applicable circumstances . . . ."  Id.  However, where, as

22

here, the issues of fact are undisputed, the court may
appropriately decide the issue on summary judgment.  <u>See</u>
<u>generally</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

Defendants first argue that Admiral unreasonably delayed in
acting to rescind the policies.  On May 24, 2004, defendants
tendered the Altman Complaint to Admiral, which contained the
information on the prior legal claims against DCC and Debber.  On
August 5, 2004, Admiral staff met and decided to file an action
to rescind the policies based upon DCC's non-disclosure of the
prior claims.  However, Admiral did not file the instant action
to rescind until February 22, 2005 and did not specifically
notify defendants of the action until March 1, 2005.  Thus, there
was a nine month period from the time Admiral learned about the
basis for rescission to the actual filing of an action to
rescind.  There was also a period of approximately seven months
from the time Admiral apparently made the decision to rescind and
the actual filing of the instant complaint.

An insurer is entitled to a reasonable time period to
investigate and act upon information regarding its right to
rescind a policy.  Here, in an environment of multiple and
ongoing litigation, nine months is not an unreasonable period of
time for an insurance company to investigate and act upon
information supporting rescission of a policy.  <u>See, e.g.,</u>
<u>Jaunich II v. National Union Fire Ins. Co.</u>, 647 F. Supp. 209,
216-17 (N.D. Cal. 1996) (finding approximately three month period
from receiving all information to time of action to rescind
reasonable); <u>Civil Serv. Employees Insur. Co. v. Blake</u>, 245 Cal.
App. 2d 196, 200-02 (1966) (finding approximate four month period

1  from date of auto policy issuance to date of action to rescind

2  reasonable); State Farm Fire & Casualty. Insur. v. McDevitt, 2001

3  WL 637419 *9 (N.D. Cal. May 21, 2001) (finding period of one year

4  from discovery of misrepresentations to action to rescind not

5  unreasonable).

6      Furthermore, the court likewise finds that the seven months

7  following Admiral's apparent decision to rescind the policy is

8  not an unreasonable period of time.  Administrative procedures

9  and reevaluations regarding the propriety of the decision could

10  easily account for this delay.  Indeed, it is more reasonable for

11  Admiral to take time to ensure proper grounds for rescission than

12  to act prematurely in a manner that could prejudice defendants.

13  The court is unpersuaded by defendants' assertion that Admiral's

14  review period was excessive.

15      Defendants also argue they sustained substantial prejudice

16  from Admiral's actions.  Defendants assert they relied on

17  Admiral's defense to cover litigation expenses, while formulating

18  an "aggressive" strategy for the Altman action.  This reliance,

19  defendants claim, caused them to retain higher priced attorneys.

20  This argument is unpersuasive.  Defendants were on notice since

21  May 28, 2004, pursuant to Admiral's reservation of rights letter,

22  that Admiral *may* later seek to rescind the contract.  In fact,

23  contrary to defendants' assertion that said letter contains

24  dense, complicated "boilerplate" language, the letter is simple,

25  straightforward and *two* pages.  The second paragraph states

26  clearly that, "Monitor is currently in the process of

27  investigating certain coverage issues."  The fifth paragraph

28  states specifically that Admiral's defense of the Altman action

1  pursuant to the policy is subject to a full and complete

2  reservation of rights, including the right to "file an action for

3  a judicial determination that [Admiral] is entitled to rescind

4  the Policy and that the Policy is void ab initio . . . ."  (SUF ¶

5  43.)  This letter should have prompted defendants to at least

6  consider a litigation strategy that did not include Admiral's

7  support.  While defendants may have made decisions hoping that

8  Admiral would continue to provide coverage, those decisions

9  amount to a calculated risk on their part.

10     As further support for their argument, defendants emphasize

11  that while originally, the firm Irell & Manella represented

12  defendants, shortly after learning of Admiral's intent to

13  rescind, defendants switched to the purportedly less expensive

14  counsel of Dempsey & Johnson P.C.  These facts do not

15  sufficiently assuage defendants' burden to show substantial

16  prejudice.  Aside from defendants' bald assertions, there is no

17  evidence that they would have adopted a less expensive legal

18  strategy earlier, if Admiral had acted more quickly to rescind.

19  Admiral agreed to pay defendants' counsel, of their choice, based

20  on panel rates.  There is no evidence that Admiral made any

21  attempt to influence defendants' choice of counsel.  Neither did

22  Admiral compel DCC to take an aggressive litigation stance.

23  Defendants made those decisions, with the advice of the counsel

24  of their choice, without any coercion or influence from Admiral.

25     Defendants also argue Admiral's involvement in the

26  litigation created additional legal expenses.  These costs

27  included consent for staffing and travel which required

28  defendants' counsel to draft written requests.  Defendants'

counsel also prepared a three page summary report with attached documents.  Defendants do not offer a quantified amount for these costs, and Admiral suggests defendants' counsel billed less than an hour for these actions.  In any case, defendants have not provided sufficient evidence to show substantial prejudice.  The preparation of short letters in response to routine communications does not rise to the level of a substantial burden.  See, e.g., State Farm Fire & Casualty, 2001 WL 637419 at *10 (finding increased attorney's fees insufficient for showing substantial prejudice).

Finally, defendants assert Admiral waived its right to rescind the policy because Admiral agreed to defend the Altman action after learning about defendants' prior undisclosed claims. This argument is unavailing.  To find waiver, California law requires an insurer to *intentionally* relinquish its rights. Waller v. Truck Ins. Exchange, Inc., 11 Cal.4th 1, 31 (1995); see, e.g., Ringler Assoc., Inc. v. Maryland Cas. Co., 80 Cal. App. 4th 1165, 1188-89 (2000) (finding that insurer's payment of defense costs for over two years did not constitute a waiver of the right to contest a duty to defend).

Defendants' reliance on Neet v. Holmes is misplaced.  25 Cal.2d 447 (1944).  In Neet, the party seeking to rescind continued to accept royalty payments on a mining lease *after* giving notice of rescission.  By accepting benefits under the contract, the plaintiffs acted as if the contract was still in existence, thereby waiving their right to rescind.  Admiral's actions here are certainly distinguishable.  Admiral agreed to defend the Altman action pursuant to a complete reservation of

26

rights, expressly claiming the right to rescind.  Admiral did not garner a benefit by assuming the defense of the Altman action, and it attempted to return defendants' premiums upon notice of rescission.  If Admiral had refused to defend the Altman action from the outset, before undertaking an investigation of the issues, Admiral may have been subject to claims for breach of contract.  The court will not impose an intention of waiver on Admiral for properly defending the matter until the basis for rescission was ascertained and investigated.

In sum, defendants fail to identify sufficient facts to support a finding that Admiral unreasonably delayed seeking to rescind the contract, or that it caused defendants substantial prejudice.  Therefore, as a matter of law, the defense of laches fails, and defendants' cross-motion for summary adjudication is DENIED.

### CONCLUSION

For the foregoing reasons, Admiral's motion for summary adjudication on its first and second claims for relief to rescind the subject Admiral EPLI Policies is GRANTED.  Defendants' cross-motion on their defense of laches is DENIED.

IT IS SO ORDERED.

DATED: July 19, 2006


/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE